IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Jason Lester, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No.: 2:07-cv-01669-PMD |
| | ) | |
| | ) | **ORDER** |
| Nationwide Mutual Insurance Company, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court upon Defendant Nationwide Mutual Insurance Company's

("Defendant" or "Nationwide") Motion for Summary Judgment. For the reasons set forth herein,

the court grants Defendant's motion.

## BACKGROUND

The facts of this case, considered in the light most favorable to Plaintiff, are as follows:

On or about October 3, 2002, Plaintiff Jason Lester ("Plaintiff") was the operator of a 1995

Nissan motor vehicle that was involved in a collision with a 1994 Cadillac motor vehicle that was

operated by Sylvia P. Smalls in Charleston County, South Carolina. In his Complaint, Plaintiff

alleges that this wreck "was due to and caused directly and proximately by the negligence, gross

negligence, carelessness, recklessness, willfulness, wantonness, and unlawful acts, delicts and

omissions of Sylvia P. Smalls." (Compl. ¶ 7.) Ms. Smalls was insured by State Farm Mutual

Automobile Insurance Company at the time of the accident, and State Farm tendered its $15,000

bodily injury liability coverage limits to Plaintiff. Although Plaintiff signed a Covenant Not To

Execute, Plaintiff reserved the right to seek recovery of any underinsured motorists ("UIM")

coverage applicable to him. In addition to the $15,000 Plaintiff obtained from State Farm, Plaintiff

received UIM benefits from Liberty Mutual Fire Insurance Company, the company that insured the Nissan vehicle in which Plaintiff was traveling. Liberty Mutual paid Plaintiff $85,000 in UIM benefits in exchange for a Policy Release, but this release does not prevent Plaintiff from seeking any other UIM coverage that might be applicable to him.

Plaintiff commenced a civil action against Ms. Smalls in the Court of Common Pleas, Charleston County, and he served Nationwide, as a UIM carrier, with a copy of the Summons and Complaint. Nationwide did not participate in the defense of this action, and the action resulted in an arbitration award dated August 21, 2006, in favor of Plaintiff in the total amount of $185,000. The net amount of the judgment, after credit for the amounts paid by State Farm and Liberty Mutual, is $85,000.

Plaintiff brought the instant action against Nationwide in the Court of Common Pleas, Charleston County, on May 7, 2007, seeking a declaratory judgment "that he was an insured under the Policy [issued by Nationwide] on the date of the [w]reck and that he is entitled to recover UIM coverage under the Policy for his unpaid damages, plus interest, from the [w]reck." (Compl. at 4.) Nationwide filed a Notice of Removal on June 14, 2007, asserting this court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. (*See* Notice of Removal at 1-2.)

Nationwide filed a Motion for Summary Judgment on March 4, 2008, asserting that Plaintiff is not entitled to recover UIM benefits under the policy at issue because he "has never been a resident of the Scotts' household." (Mem. in Supp. at 1.)[1] Plaintiff filed a Response in Opposition on March 24, 2008, asserting "there are genuine issues of material fact whether Plaintiff was a resident of his father-in-law Charles Scott's . . . household at the time of the subject collision and

---

[1]Plaintiff is the son-in-law of Mr. and Mrs. Scott.

whether Plaintiff's status as an 'insured driver' on Scott's insurance policy entitled him to recover underinsured motorists . . . insurance coverage as an 'insured' under that policy." (Resp. in Opp'n at 1.) Nationwide filed a Reply on March 28, 2008.

## STANDARD OF REVIEW

To grant a motion for summary judgment, the court must find that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The judge is not to weigh the evidence but rather must determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). All evidence should be viewed in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The "obligation of the nonmoving party 'is particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting *Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir. 1990)). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Celotex*, 477 U.S. at 327.

## ANALYSIS

The Nationwide policy at issue in this case is Policy Number 53 45 Q 448297 (the "Policy").

Before beginning an analysis of the issues, it is helpful to review the relevant language from the

Policy.  The Policy states, in Part D entitled "Uninsured Motorists Coverage,"

> We [Nationwide] will pay, in accordance with Va. Code Ann. Section 38.2-2206, damages which an insured or an insured's legal representative is legally entitled to recover from the owner or operator of an uninsured motor vehicle or an underinsured motor vehicle because of:
>     1.  Bodily injury sustained by an insured and caused by an accident; and
>     2.  Property damage caused by an accident.
>
> The owner or operator's liability for these damages must arise out of the ownership, maintenance, or use of the uninsured motor vehicle or underinsured motor vehicle.
>
> We will pay damages under this coverage caused by an accident with an underinsured motor vehicle only after the limits of liability under any applicable bodily injury liability or property damage liability bonds or policies have been exhausted by payment of judgments or settlements.

(Mot. for Summ. J. Ex. 1 at 21; Policy at U1.)  The term "insured" "as used in this Part [(Part D)]

means: 1. You or any family member.  2.  Any other person occupying or using your covered auto.

3.  Any person for damages that person is entitled to recover because of bodily injury to which this

coverage applies sustained by a person described in 1. or 2. above."  (Mot. for Summ. J. Ex. 1 at 21;

Policy at U1.)  In a section delineating the definitions applicable throughout the Policy, "you" and

"your" refer to:

    1.  The "named insured" shown in the Declarations; and
    2.  The spouse if a resident of the same household.

(Mot. for Summ. J. Ex. 1 at 7; Policy at D1.)  Charles R. Scott and Carol Sue Scott are both listed

as named insureds.  (Mot. for Summ. J. Ex. 1 at 1.)  The term "family member" means "a person

related to you by blood, marriage or adoption who is a resident of your household."  (Mot. for

4

Summ. J. Ex. 1 at 7; Policy at D1.)

## A.    Whether Plaintiff Is a Resident of the Scott Household

One of the questions before this court is whether Plaintiff fits the definition of a "family member" pursuant to the Policy.  Nationwide acknowledges that the "first part of the 'resident relative' equation is not at issue" because Plaintiff is the son-in-law of Mr. and Mrs. Scott, the named insureds.  (Mem. in Supp. at 1.)  Nationwide asserts, however, that Plaintiff is not a "family member" because Plaintiff "has never been a resident of the Scotts' household."  (*Id.*)  The court must thus determine whether there is a genuine issue of material fact concerning whether Plaintiff was a resident of the Scotts' household at the time of the accident.

Both parties agree that because this Policy was issued in Virginia to a Virginia resident, Virginia law applies unless South Carolina Code Section 38-61-10 requires the application of South Carolina law to these facts.  (*See* Mem. in Supp. at 7; Resp. in Opp'n at 2.)  While both parties seemingly acknowledge the lack of clarity as to whether Section 38-61-10 requires the application of South Carolina law, they both agree that Virginia law should be applicable.  (Mem. in Supp. at 7-9; Resp. in Opp'n at 2-3.)  As both parties agree, the court therefore assumes that Virginia law is applicable.

The courts of Virginia have repeatedly addressed the issue of when a person is considered a resident of a household.  In an opinion from 1986, the Supreme Court of Virginia stated,

> The meaning of "resident" or "residence," a prolific source of litigation, depends upon the context in which it is used. . . . Here, we must interpret the meaning of "resident," when followed by "of the same household."  The word "household," . . . connotes a settled status; a more settled or permanent status is indicated by "resident of the same household" than would be indicated by "resident of the same household or apartment."

*Allstate Ins. Co. v. Patterson*, 344 S.E.2d 890, 892 (Va. 1986) (quoting *State Farm Mut. Auto. Ins.*

5

*Co. v. Smith*, 142 S.E.2d 562, 565-66 (1965), *overruled on other grounds by State Farm Mut. Auto. Ins. Co. v. Jones*, 383 S.E.2d 734 (Va. 1989)).  The court further stated,

> Whether the term "household" or "family" is used, the term embraces a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character, under one roof; a collective body of persons living together within one curtilage, subsisting in common and directing their attention to a common object, the promotion of their mutual interests and social happiness.

*Id.* (quoting *State Farm v. Smith*, 142 S.E.2d at 565-66 n.6) (internal quotation marks omitted); *see also Gov't Employees Ins. Co. v. Allstate Ins. Co.*, 369 S.E.2d 181, 184 (Va. 1988).  The term "residence" "'emphasizes membership in a group rather than an attachment to a building.'" *Patterson*, 344 S.E.2d at 893 (quoting *American States Ins. Co., W. Pac. Div. v. Walker*, 486 P.2d 1042, 1044 (Utah 1971)).

At least in the insurance context, it appears that a person may be a resident of more than one household at the same time.  *See Nationwide Mut. Ins. Co. v. Robinson*, 36 Va. Cir. 193 (Va. Cir. Ct. 1995).  In determining whether a person qualifies as a resident of a particular household, "a person's intent is important."  *Furrow v. State Farm Mut. Auto. Ins. Co.*, 375 S.E.2d 738, 740 (Va. 1989); *see also Patterson*, 344 S.E.2d at 893.  "[W]hile a person's intention to become a member of a particular household need not be coupled with continuous residence, the intention must be accompanied by a reasonable degree of regularity in the person's residential contacts with the household; casual, erratic contacts are not sufficient."  *Patterson*, 344 S.E.2d at 893.  Based on the language of *Smith* and *Patterson*, the United States District Court for the Western District of Virginia concluded that the determination of whether an individual resides in a particular household contains both a subjective and objective component.  *Dawson v. Auto-Owners Ins. Co.*, No. 6:07cv00037, 2008 WL 1836506, at *3 (W.D. Va. Apr. 23, 2008).  The court stated, "A plaintiff

6

must intend to be a member of the policyholder's household, and must clearly evidence that intention through his actions." *Id.*

Because the determination of whether a person is a resident of a particular household depends upon the facts, the court will review some opinions from the courts of Virginia. In *Patterson*, the insurer brought a declaratory judgment action for a determination of whether Patterson was an insured under the terms of the policy, and the jury concluded Patterson was a member of his father's household. *Patterson*, 344 S.E.2d at 891. The insurer appealed, arguing the trial court erred in refusing to hold as a matter of law that Patterson was not a resident of his father's household on the date of the accident. *Id.* Patterson was twenty-six at the time of the accident, and he had lived with his parents in the family home until 1971, when he married and moved into an apartment with his wife. *Id.* When he got divorced two years later, he returned to his parents' home, and in 1973, he moved into an apartment complex owned by his father. *Id.* When the complex was sold in 1976, Patterson again returned to his parents' home. *Id.*

> On each of these occasions, Patterson took with him all of his personal belongings when he moved from his parents' home, and he changed his mailing address and the address on his driver's licence and motor vehicle registration. Then, each time he returned to his parents' home, he brought with him all his personal belongings, and he changed his mailing address and the address on his operator's license and registration card. On each return, he occupied the same room he used as a boy, and he resumed the chores he always performed while living with his parents.

*Id.*

In 1976, Patterson became a member of the motorcycle group known as the "Renegades," and he stayed in the clubhouses owned by the Renegades between 1976 and 1978, and when he left his parents' home on trips for the Renegades, he took "only a bedroll and two or three changes of clothes, leaving the remainder of his personal belongings behind." *Id.* at 892. He returned to his

parents' home when he was not staying at one of the clubhouses or "visiting around." *Id*. When he returned, he stayed in his childhood bedroom, and his mother laundered his clothes and prepared his meals. *Id*. He maintained his parents' address with the Division of Motor Vehicles as well for purposes of his banking activities. *Id*. On the witness stand, Patterson admitted that "'based on his own estimate,' he had stayed at his parents' home approximately 10% of the time in the period between early 1976 and the date of the accident in 1979." *Id*. He insisted, however, "that his 'father's home . . . was his home.'" *Id*.

The Supreme Court of Virginia concluded the trial court erred in refusing to hold as a matter of law that Patterson was not a resident of his father's household on the date of the accident. *Id*. at 893-94. Patterson's administrator argued that "Patterson's intent with respect to membership in the family group was important, . . . and his conduct reflected his intent;" the administrator pointed, *inter alia*, to the fact that Patterson used his parents' address on his driver's license, used his parents' address with respect to his banking institution, and kept all but a few changes of clothes at his parents' house. *Id*. at 893. Notwithstanding this evidence, the Supreme Court of Virginia concluded that "whether Patterson qualified as a resident of his father's household was a question upon which reasonable persons should not differ, given the facts and circumstances of this case." *Id*. The court stated,

> Patterson's own words and conduct bespeak the casual, erratic nature of his residential contacts with his father's household and belie his professed intent to make that household his own. Patterson testified that he stayed at his parents' home only "when [he] wasn't staying at one of the [Renegades'] clubhouses or visiting around," and he estimated that he spent only about 10% of his time at his parents' home after early 1976. From the time Patterson became a member of the Renegades until the moment of the accident, he led an existence best described as nomadic, with no regular place of residence, either at his parents' home or elsewhere.

*Id.*[2]

In *Phelps v. State Farm Mutual Automobile Insurance Co.*, 426 S.E.2d 484 (Va. 1993), the issue was whether two college students were residents of their mother's household. Until the sisters (Mary Catherine and Anna) went away to college, they lived with their mother and two younger sisters. *Phelps*, 426 S.E.2d at 485. The mother told them that when they turned eighteen they were on their own, and while the mother had a family automobile insurance policy, she told the sisters to get automobile insurance as soon as they left home. *Id.* Mary Catherine left home in the summer of 1987 to attend college, and she removed all of her possessions from her mother's home with the exception of a "box of junk" containing "things that [she] didn't want to throw away [but] didn't

---

[2]The United States District Court for the Western District of Virginia distinguished *Patterson* in *Dawson v. Auto-Owners Insurance Co.*, No. 6:07cv00037, 2008 WL 1836506 (W.D. Va. Apr. 23, 2008). The issue was whether Dawson was a resident of his mother's household, and while Dawson lived on his own for many years, in May of 2005, he transferred his belongings to his mother's house. *Dawson*, 2008 WL 1836506, at *1. At the same time, he purchased a new tractor and began working as a long-haul trucker. *Id.* Being a long-haul trucker, Dawson was on the road for significant stretches of time, and "[t]ypically, he work[ed] for several weeks and then return[ed] to his mother's house for periods ranging from four days to a week." *Id.* Dawson kept his personal belongings at his mother's house, and while he received unsolicited mail there, the majority of his mail was directed to a post office box. *Id.* at *2.

The court noted that while there were "significant similarities" between the case and *Patterson*, "there is a key difference that renders summary judgment inappropriate." *Id.* at *4. The court stated,

> The majority of the time Dawson was away from his mother's home he was working. While he was on the road Dawson spent most of his time in his truck or occasionally in hotel rooms. By contrast, Patterson had no regular employment and lived at various clubhouses by choice. Dawson's time spent on the road does not necessarily undercut his claim that he views his mother's home as his home because he spends the majority of his free time at his mother's home. Patterson, who was unemployed, had virtually unlimited free time and yet chose to spend over 90 percent of his time at various clubhouses and apartments, contradicting his claim that he viewed himself as residing in his parent's household.

*Id.* Determining that reasonable persons could disagree as to whether Plaintiff was a member of his mother's household, the court denied both the plaintiff's and the defendant's motions for summary judgment. *Id.* at *4-5.

9

want to drag with [her]." *Id*. She lived in the dorm, then with a friend, and then she moved into a townhouse in the fall of 1988 with her boyfriend. *Id*. Mary Catherine obtained her own automobile insurance, and she changed the address on her driver's license from her mother's address to her Northern Virginia address. *Id*. Anna left home in the summer of 1988 to attend college, and she left "nothing important" behind. *Id*. She eventually moved into the townhouse with Mary Catherine, and although she did not plan to live with Mary Catherine forever, she never "intended 'to move back to [her mother's home].'" *Id*. Anna also obtained automobile insurance on her own and changed her driver's license address from her mother's address to her Northern Virginia address. *Id*. at 485-86.

Both sisters obtained full time employment near the college they attended, and both had checking accounts in Northern Virginia banks. *Id*. at 486. The mother did not assist the sisters financially, with the exception of the fact that the mother made a loan to Mary Catherine for a deposit on the townhouse. *Id*. On the mother's tax forms for the years 1988 and 1989, the mother claimed Mary Catherine and Anna as dependents; she testified the accountant told her she could claim them as long as they were students. *Id*. The mother was employed, and she obtained health and medical insurance coverage for Mary Catherine and Anna. *Id*. The daughters visited their mother: Anna "went home maybe once a month for a week end or holiday" and for two weeks at Christmas, and Mary Catherine visited about once every two months. *Id*. When they did return for a visit, the sisters had to sleep on a sofa because the bedrooms they previously occupied had been taken over by other family members. *Id*.

During June of 1989, the sisters returned home to go to a wedding, and Anna was injured in a car accident. *Id*. Anna stayed with her mother for about a month after the accident, recuperating

from her injuries, and she then returned to Northern Virginia. *Id.* Although the court acknowledged that State Farm cited a number of cases from other jurisdictions "in which the courts generally have held that a college student living away from home retains his or her status as a resident of the family household," the court concluded all of those cases were distinguishable. *Id.* at 487. The court then inquired into the intent of Mary Catherine and Anna, "bear[ing] in mind that Anna . . . ha[s] the burden of proof on the issue of household membership." *Id.* at 487-88. The court concluded that the sisters were not residents of their mother's household: their mother told them that when they turned eighteen, they were on their own; Anna indicated she never intended to move back to her mother's house; both sisters left nothing important behind at their mother's house; the sisters signed a lease together in Northern Virginia; both were employed full time and had bank accounts in Northern Virginia; both changed their driver's licenses to reflect their Northern Virginia address; and both paid for their own automobile insurance. *Id.* at 488.

State Farm pointed to the fact that the mother claimed the sisters as dependents, and the sisters listed their mother's address on their income tax returns. *Id.* The court concluded, however, that this evidence was "either irrelevant or immaterial on the question of what may have been Anna's and Mary Catherine's intent on the date of the accident with respect to membership in their mother's household." *Id.* With respect to the mother's tax returns, "there is nothing in the record to suggest that the two daughters, or either of them, had any knowledge of, or ever approved, [their mother's] action in listing them as dependents on her income tax returns." *Id.* With respect to the address listed on the sisters' income tax returns, the court concluded this evidence "is not entitled to persuasive weight" because "[n]either sister was asked at trial to explain the use of the address, and the trial judge apparently did not consider the point of sufficient importance to even mention

11

it in his letter opinion." *Id*.  The court thus concluded that the sisters were not residents of the mother's household. *Id*. at 489.

Having examined the relevant law, the court will now examine the evidence in the record to determine whether a genuine issue of material fact exists as to whether Plaintiff was a resident of the Scott household.  Plaintiff is married to Kelly Paige Lester ("Kelly"), and Kelly is the daughter of Charles and Carol Scott.  (Charles Scott Dep. 3:23-4:8.)[3]  Mr. and Mrs. Scott live in Vansant, Virginia. (Charles Scott Dep. 3:19-3:20.) Mr. Scott purchased a Pontiac Firebird for Kelly as a graduation present, and Mr. Scott maintained insurance on the Firebird.  (Charles Scott Dep. 13:7-14:3.)  While Kelly had possession of the car, it was titled in Mr. Scott's name.  (Charles Scott Dep. 14:4-14:11.)  Kelly still had this car when she married Plaintiff, and Mr. Scott added Plaintiff as a driver on Scott's insurance policy.  (Charles Scott Dep. 14:4-15:8.)

Plaintiff and Kelly married in 1996, and Kelly deposed that when she married Plaintiff, she did not have any permanent plans to stay with her parents, the Scotts.  (Kelly Dep. 5:4-5:6; 23:13-23:20.)  Plaintiff further deposed that at the time he married Kelly, he was not living with the Scotts.  (Pl. Dep. 26:6-26:10.)  At the time the two got married, Plaintiff was living in Nashville completing a twelve or thirteen month course of study at the Nashville Auto Diesel College.  (Kelly Dep. 5:7-6:16.)  At Plaintiff's deposition, he was asked whether he intended the Nashville residence to be a permanent residence of any sort, and Plaintiff replied, "Our only permanent residence is Virginia.  I mean, we never intended when we moved for either of the places to sum up all the cities and schools quickly to be our permanent residence or to reside there for life.  We always intended on

_____

[3]While Nationwide points out that technically Kelly is Mr. Scott's step-daughter, such fact is irrelevant for purposes of this motion, as Mrs. Scott, Kelly's mother, is also a named insured on the Policy at issue.  (*See* Mem. in Supp. at 1 n.1.)

moving back home." (Pl. Dep. 70:1-70:10.) When Plaintiff finished the diesel school program, Plaintiff and Kelly moved to the Greensboro, North Carolina, area. (Kelly Dep. 6:20-6:22.) Mrs. Scott deposed that she and Mr. Scott "got them," meaning Plaintiff and Kelly, a trailer when they moved to North Carolina, but they moved out of the trailer and into an apartment. (Carol Scott Dep. 13:9-13:17.) It also appears that Mr. Scott's name was listed on the first apartment lease. (Pl. Dep. 16:22-17:3.)

While living in North Carolina, both Plaintiff and Kelly attended the University of North Carolina at Greensboro, and Plaintiff obtained an associate's degree while Kelly obtained a bachelor's degree. (Pl. Dep. 16:9-16:18.) While Plaintiff and Kelly lived in North Carolina, they obtained North Carolina driver's licenses and filed North Carolina resident tax returns. (Pl. Dep. 25:11-26:20; Kelly Dep. 7:3-7:9.)[4] Both Plaintiff and Kelly deposed that they took these actions in order to obtain the benefits of in-state tuition rates. (Pl. Dep. 25:17-25:20; Kelly Dep. 7:3-7:9.)

When asked whether Mr. and Mrs. Scott "continue[d] to help with . . . school" when Plaintiff and Kelly were living in North Carolina, Plaintiff stated, "Well, I guess their way of helping me was me coming home every weekend and working. That's why I was staying, yeah, I would get paid extremely well, but I guess that was them contributing too." (Pl. Dep. 55:18-55:24.) Even though Mr. and Mrs. Scott gave Plaintiff and Kelly some money while they were living in Greensboro, the "main source" of income for Plaintiff and Kelly was their own income. (Charles Scott Dep. 10:10-10:14.) Plaintiff and Kelly stayed in North Carolina for approximately two years. (Kelly Dep. 38:4-

---

[4]It appears Plaintiff filed North Carolina resident tax returns, but it is not absolutely certain from the record. Plaintiff deposed that in order to obtain the benefits of in-state tuition at the University of North Carolina at Greensboro, he had to "show [he] was paying state taxes." (Pl. Dep. 26:4.)

38:7.)

After Kelly graduated from the University of North Carolina at Greensboro in December of 2000, she obtained a job in Goose Creek, South Carolina, working at a day care facility. (Kelly Dep. 4:13-4:16; 46:1-46:15.) Plaintiff and Kelly thus moved to South Carolina in early 2001. (Kelly Dep. 4:15-4:16.) After moving to South Carolina, Plaintiff applied to go to school at New Horizons, and both Plaintiff and Kelly obtained South Carolina driver's licenses. (Kelly Dep. 10:9-10:21; Pl. Dep. 12:18:12:22.) Plaintiff deposed that he and his wife obtained South Carolina driver's licenses because he wanted the benefits of in-state tuition. (Pl. Dep. 12:19-12:22.) While living in Charleston, Plaintiff was employed at Morris Nissan, and he worked approximately thirty hours a week in the sales and service departments. (Pl. Dep. 9:23-9:25; 11:14-11:23.)

While in Charleston, Plaintiff and Kelly rented an apartment in West Ashley. (Pl. Dep. 6:1-6:13.) Kelly deposed that she was not sure whose name was on that lease, but the utilities were in her name. (Kelly Dep. 11:2-11:7.) The couple's tax returns filed while they were living in Charleston listed Charleston as their address, and they filed a South Carolina income tax return. (Kelly Dep. 11:23-12:1; Pl. Dep. 37:25-38:4.) Plaintiff deposed that while he and Kelly were living in Charleston, Mr. Scott did not claim either one of them as dependents on his tax returns. (Pl. Dep. 41:11-41:14.) Indeed, Plaintiff deposed that no one had claimed him as a dependent since he was in high school. (Pl. Dep. 41:7-41:10.) The following exchange also occurred at Plaintiff's deposition:

> Q.     Okay. So as I understand your testimony, how often would you come to Virginia while you were living in Charleston?
> A.     While we were living in Charleston, at least a couple to three times a month.
> Q.     Okay. Two to three times a month?
> A.     Two to three times a month.
> Q.     Okay. And that would be for weekends?

> A.     Weekends, yes, sir.
> Q.     Okay.  And while you were here, you would work for her dad?
> A.     Yes, sir.
> Q.     Okay.  And you would always stay at her dad's place?
> A.     Every weekend, every time we were in.
> Q.     Okay.  You did not stay at your dad's place?
> A.     No.  We had our own room at her house.
> Q.     Okay.  And that was the room that she, quote, grew up in that you had?
> A.     That was our room.
> Q.     Okay.  And did that room have any of your furniture in it?
> A.     La-Z-Boy.
> Q.     Okay.
> A.     And a few pictures and whatnot, nothing major.

(Pl. Dep. 47:18-48:19; *see also* Kelly Dep. 18:8-18:12.)

As noted above, Plaintiff was involved in a motor vehicle accident on October 3, 2002, while the couple was living in Charleston.  (Pl. Dep. 5:13-5:25.)  The vehicle Plaintiff was driving at the time of the accident was titled to Plaintiff's father, not Mr. Scott.  (Pl. Dep. 52:18-52:22.)  At some point in 2003, the couple decided to move back to Virginia.  (Kelly Dep. 15:16-15:19; 18:21-18:24.)  The following exchange occurred at Plaintiff's deposition:

> Q.     When did you and your wife decide, yeah, we're going to move back to the area where you grew up in?
> A.     Before we moved away from the area, before we started school rather.  Not before we moved away.
> Q.     Did you look for any jobs in the Charleston area?
> A.     No.  We didn't want to.  We were coming home.  I mean, we'd always planned on this is our home.
> Q.     Okay.
> A.     The only reason we ever left Vansant and Grundy, Virginia, was for school and education, unless you want to dig coal.

(Pl. Dep. 63:20-64:9.) When Kelly left Charleston, she went back and lived with her parents for several months, but Plaintiff stayed in Charleston and worked. (Kelly Dep. 39:9-15.) Kelly deposed that she and Plaintiff did not consider moving into the Scotts' home upon leaving Charleston. (Kelly Dep. 24:25-25:5.) She did, however, depose as follows:

15

Q.      Since you were married, and, well, let me ask you this.  When you all became married, have you at any point intended for you to have a separate, quote, residence than your husband?
A.      Separate residence from?
Q.      From your husband, apart from your husband?
A.      Me have a separate residence?
Q.      Right.
A.      No.
Q.      If you thought that home and your permanent place of residence was there at the Scott residence, did you also think that as a married couple, your husband's was there too?
A.      Yes.

(Kelly Dep. 48:20-49:9 (objection omitted).)  When Plaintiff left Charleston, he moved directly into the couple's apartment in Abingdon, Virginia.  (Kelly Dep. 39:16-39:20.)  Abingdon is approximately an hour and a half away from the Scotts' home.  (Kelly Dep. 35:22-35:25.)

Both Plaintiff and Kelly deposed that they never intended their stays in Nashville, Greensboro, or Charleston to be permanent.  (Pl. Dep. 70:5-70:10; Kelly Dep. 43:5-48:17 (objection omitted).)  Furthermore, Plaintiff deposed that if he and Kelly were not in school, they were at the Scotts' residence.  (Pl. Dep. 27:18-28:3.)  Plaintiff and his wife kept some of their belonging at the Scotts' house, and they had a room there.  (Pl. Dep. 27:6-28:3; 77:5-77:21; 48:5-48:13.)  Although Plaintiff's driver's licence never reflected the address of the Scott residence, he did receive "one or two things," such as a student loan bill, at the Scotts' residence.  (Pl. Dep. 28:4-28:11; 78:12-78:25.)  In addition, Plaintiff and Kelly received some financial support from Mr. and Mrs. Scott.  (Pl. Dep. 41:15-42:10; 55:4-56:11.)

Having examined all of the evidence in the record, the court concludes there is no genuine issue of material fact regarding whether Plaintiff was a resident of the Scotts' household.  Plaintiff argues that intent is crucial in making this determination, and Plaintiff is correct.  *See Patterson*, 344 S.E.2d at 893.  A person's stated intent, however, is not determinative.  *See id*. at 892 (concluding

16

as a matter of law that Patterson was not a resident of his father's household even though he "insisted . . . that his 'father's home . . . was [his] home"); *see also Dawson*, 2008 WL 1836506, at *3 (noting that the determination of whether an individual resides in a particular household contains both a subjective and objective component).

While Plaintiff states he intended to be a resident of the Scott household, the evidence does not objectively support that intent. Unlike in *Dawson*, this is simply not a case where Plaintiff was *returning* to his childhood home. In fact, Plaintiff *never* moved all of his belongings into the Scott household. While Plaintiff spent Christmas vacations, holidays, and two weekends a month at the Scotts' home, the longest continuous period he spent there was two weeks. He kept clothes and a toothbrush there so he did not have to pack. (Pl. Dep. 27:14-27:17.) Plaintiff and his wife lived in Greensboro, North Carolina, for approximately two years, where they went to school and filed North Carolina tax returns. They also lived in Charleston, South Carolina, for about a year and a half, and they had South Carolina driver's licenses and filed South Carolina income tax returns. Even though both Plaintiff and Kelly deposed that they took those actions in order to obtain in-state tuition, the fact remains that the couple maintained their own primary residence outside of the Scott household, and they have done so since they got married in 1996. It is clear from the record that the Scotts are very close to Plaintiff and Kelly, but the fact that Plaintiff and Kelly traveled to Virginia to visit often does not create a genuine issue of material fact. While mindful that current residence is not necessarily indicative of intent at the time of the accident, it is interesting to note that even when Plaintiff moved back to Virginia, back home, he did not move into the Scott residence. Thus, while Plaintiff and Kelly may have always intended to return to Virginia, such intent does not necessarily reflect an intent for Plaintiff to become a resident of the Scott household. Plaintiff did not ever

17

reside with the Scotts for longer than two weeks at a time before the accident or thereafter and does not reside with them now. The court therefore determines no reasonable jury could conclude that Plaintiff was a resident of the Scott household at the time of the accident.

**B.    Whether Plaintiff Is Entitled to UIM Coverage Because He Is Listed as an "Insured Driver" on the Policy**

Nationwide next argues it is entitled to summary judgment because the designation of Plaintiff as an "insured driver" on the Policy does not make Plaintiff entitled to underinsured motorist coverage. (Mem. in Supp. at 11.) Nationwide states, "There is nothing in the policy itself which affords a 'driver' any rights to claim underinsured motorist coverage when the driver is not occupying the insured vehicle. The uninsured policy language . . . does not list 'drivers' or 'insured drivers' as entitled to underinsured motorist coverage or uninsured coverage." (*Id.*) Nationwide acknowledges "[t]here is a minority line of cases from jurisdictions applying the 'reasonable expectations' doctrine which hold that such language could lead a reasonable insured to believe that despite the lack of insuring language in the policy, a person might believe that an 'insured driver' is entitled to uninsured motorist coverage." (*Id.*) However, while Virginia does not "appear to have a case directly addressing the issue," "it is reasonably clear that Virginia's high court would follow the majority position . . ." (*Id.*) Nationwide states, "This Court can reasonably predict that Virginia's highest court would follow the example of South Carolina and the majority of other jurisdictions and would not allow the doctrine of 'reasonable expectations' to circumvent the otherwise clear language of the insurance policy itself." (*Id.* at 13-14.)

Plaintiff acknowledges that Virginia courts "have not addressed the precise issue of whether a person listed as an 'insured driver' is an 'insured' on an automobile insurance policy." (Resp. in Opp'n at 12-13.) Plaintiff submits, however, "that Virginia courts would find that the use of the

18

term under the facts of the present case would preclude summary judgment in favor of the insurer for two reasons: first, the term creates an ambiguity which must be resolved in favor of the insured; and, second, to deny 'insured' status to one designated by the insurer as an 'insured driver' under the present facts would be contrary to the reasonable expectations of the insured." (*Id*. at 13.) Plaintiff further states,

> The subject policy extends UIM coverage to "insureds," which is defined to include "you." "You" is defined in the policy as including "the 'named insured' shown in the Declarations." The policy does not define the term "named insured." Plaintiff is named in the declarations page under the heading "insured drivers."

(*Id*.)

Plaintiff is correct in asserting that the "Definitions" section of the Policy does not include a definition for "named insured." The court concludes, however, that no ambiguity exists. As delineated above, The "Uninsured Motorists Coverage" part of the Policy (Part D) states, "We will pay . . . damages which an insured . . . is legally entitled to recover from the owner or operator of an uninsured motor vehicle or an underinsured motor vehicle because of: 1. Bodily injury sustained by an insured and caused by an accident . . ." (Mot. for Summ. J. Ex. 1 at 21, Policy at U1.) The term "insured" "as used in this Part [(Part D)] means: 1. You or any family member. 2. Any other person occupying or using your covered auto. 3. Any person for damages that person is entitled to recover because of bodily injury to which this coverage applies sustained by a person described in 1. or 2. above." (Mot. for Summ. J. Ex. 1 at 21; Policy at U1.) In a section delineating the definitions applicable throughout the Policy, "you" and "your" refer to:

1. The "named insured" shown in the Declarations; and
2. The spouse if a resident of the same household.

(Mot. for Summ. J. Ex. 1 at 7; Policy at D1.) Charles R. Scott and Carol Sue Scott are both listed

as named insureds.  (Mot. for Summ. J. Ex. 1 at 1.)  The term "family member" means "a person

related to you by blood, marriage or adoption who is a resident of your household."  (Mot. for

Summ. J. Ex. 1 at 7; Policy at D1.)

Under Virginia law, "an insurance policy is a contract to be construed in accordance with

the principles applicable to all contracts."  *Seabulk Offshore, Ltd. v. American Home Assurance Co.*,

377 F.3d 408, 419 (4th Cir. 2004) (citing *Graphic Arts Mut. Ins. Co. v. C.W. Warthen Co.*, 397

S.E.2d 876, 877 (Va. 1990)).  If an insurance policy's language is clear and unambiguous, the court

does not apply the rules of construction but rather gives the language "its plain and ordinary

meaning and enforce[s] the policy as written." *Id.* (citing *P'ship Umbrella, Inc. v. Fed. Ins. Co.*, 530

S.E.2d 154, 160 (Va. 2000)).  In explaining Virginia law, the Fourth Circuit further stated,

> Conversely, when the policy language is ambiguous and the intentions of the parties
> cannot be ascertained, the policy must be construed strictly against the insurer and
> liberally in favor of the insured, so as to effect the dominant purpose of indemnity
> or payment to the insured.  Policy language is deemed ambiguous when it may be
> understood in more than one way or when such language refers to two or more things
> at the same time.

*Id.* (internal quotation marks and citations omitted).

In the case *sub judice*, there is no ambiguity in the Policy and the court will therefore

interpret the Policy as written.  Plaintiff does not qualify as an "insured" as that term is defined in

Part D of the Policy, as he does not meet the definition of "you" or "family member."  First, Plaintiff

does not meet the definition of "family member" under the Policy, as the court has concluded that

no reasonable jury could conclude Plaintiff was a resident of Mr. and Mrs. Scott's household at the

time of the accident.  Second, Plaintiff does not meet the definition of "you" because he is not a

"'named insured' shown in the Declarations."  While Plaintiff is correct that the Policy does not

*define* "named insured," the Policy does plainly list "Charles R & Carol Sue Scott" as the named

insured on page one and three of the Declarations.  (Mot. for Summ. J. Ex. 1 at 1, 3.)  Also on page

three of the Declarations is a list of "insured drivers," and the following individuals are listed:

Charles R. Scott, Carol S. Scott, Heather Lowe, Jason Lester, Kelly Lester, Jason M. Lowe.  (Mot.

for Summ. J. Ex. 1 at 3.)  Because the plain language of the Policy indicates that Plaintiff does not

meet the definition of "you" or "family member," he therefore does not meet the definition of an

"insured."  Because he does not meet the definition of an insured, he is not entitled to coverage

pursuant to the Policy.[5]

        To the extent Plaintiff argues he is entitled to UIM benefits simply because he was listed on

the Policy as an "insured driver," the court disagrees.  A similar argument was made in *Nationwide*

*Mutual Insurance Co. v. Williams*, 472 S.E.2d 220 (N.C. Ct. App. 1996).  The Court of Appeals of

North Carolina rejected the defendant's "contention that the term 'driver' is synonymous with

'named insured.'" *Williams*, 472 S.E.2d at 222 (citing *Brown v. Truck Ins. Exchange*, 404 S.E.2d

---

        [5]Finding the policy language unambiguous, the court does not reach Plaintiff's argument
that he is entitled to UIM coverage pursuant to the reasonable expectations doctrine.  *See Wright
v. State Farm Mut. Auto. Ins. Co.*, No. LE-1738, 1983 WL 210249, at *1 (Va. Cir. Ct. Mar. 8,
1983) ("The doctrine of reasonable expectations is a unique and tempting theory[;] however, the
language of the policy clearly does not include the father's car."); *see also Nat'l Elec. Mfrs.
Ass'n v. Gulf Underwriters Ins. Co.*, 162 F.3d 821, 825 n.4 (4th Cir. 1998) ("With respect to
every claim that potentially falls within a policy exclusion the insured will 'expect' he has
coverage.  Were application of the reasonable-expectation doctrine extended to unambiguous
insurance policies, the terms bargained for by the parties would too often be ignored or
modified."); *Firemen's Ins. Co. of Washington, D.C. v. Kline & Son Cement Repair, Inc.*, 474 F.
Supp. 2d 779, 797 (E.D. Va. 2007) (noting that (1) Virginia has never explicitly adopted the
reasonable expectations doctrine, and (2) that even if the court were to find the doctrine
applicable, "it would only be relevant to this Court's analysis so as to give meaning to
*ambiguous* Policy provisions"); *Norfolk & W. Ry. Co. v. Accident & Cas. Ins. Co. of Winterthur*,
796 F. Supp. 929, 933 (W.D. Va. 1992) ("The Virginia courts have not explicitly adopted the
'reasonable expectations' test, by which a court examines the objectively reasonable
expectations of the contracting parties *to give meaning to ambiguous policy provisions*, but this
court believes that the 'reasonable expectations' doctrine is enough a part of Virginia law to
warrant its application to the facts of this case."(emphasis added)).

172 (N.C. Ct. App. 1991)).  In *Brown*, one of the issues was whether Carl Brown was a "named insured."  *Brown*, 404 S.E.2d 172.  The court stated, "Carl Brown is not listed as the 'named insured.'  We can find no case, and plaintiff[] cites none to us, which in any way expands the term 'named insured' beyond its explicit common sense meaning."  *Id*. at 175.

In *In re Smith v. Moore (Ex Parte United Services Automobile Association)*, 365 S.C. 50, 614 S.E.2d 652 (Ct. App. 2005), the Court of Appeals of South Carolina adopted the majority view and held "that listing an individual as an operator on the declarations page of an insurance policy does not make that individual a named insured."  *Ex Parte United States Servs. Auto. Ass'n*, 365 S.C. at 56, 614 S.E.2d at 655.  In that case, Becky Smith was driving a vehicle insured by USAA under a policy issued to Betty Washnok, who owned the vehicle.  *Id*. at 52, 614 S.E.2d at 653.  Washnok owned two vehicles, and although Washnok was the named insured, Smith was listed as an "operator."  *Id*. at 52-53, 614 S.E.2d at 652.  Because Smith was driving Washnok's vehicle with permission, Smith was entitled to UIM coverage on that vehicle as a permissive user.  *Id*. at 53, 614 S.E.2d at 653.  Smith, however, sought to stack UIM coverage from Washnok's other vehicle.  *Id*. at 53, 614 S.E.2d at 653.  USAA moved to be dismissed from the case, arguing that Smith was not a Class I insured and therefore not entitled to stack UIM coverage.  *Id*. at 53, 614 S.E.2d at 653.

The issue was "whether an insured who is listed on the policy as an 'operator' can stack UIM coverage."  *Id*. at 53, 614 S.E.2d at 653.  "The Smiths' argument [was] essentially that USAA's inclusion of Smith as an 'operator' on the declarations page of the policy created an ambiguity as to whether she was a named insured and such ambiguity should be resolved in favor of coverage."  *Id*. at 54, 614 S.E.2d at 654.  While the court noted that some courts have found in favor of coverage in similar situations, the majority view "is that listing a driver on the declarations page . . . does not

22

make that person a named insured."  *Id*. at 54, 614 S.E.2d at 54-55.  The court stated,

> [E]ven though "operator" is not defined in the policy, the policy is not ambiguous.
> Where a term is not defined in a policy, it is to be defined according to the usual
> understanding of the term's significance to the ordinary person. The term "operator"
> has been construed somewhat more expansively than "driver" in this state, but has
> not been contemplated to extend beyond mere use of the vehicle.  In addition, the
> policy defines "you" and "your" as "the 'named insured' shown in the declarations."
> The only person listed in the "Named Insured" box on the declarations page was
> Washnok.  Thus, we see no ambiguity.

*Id*. at 55-56, 614 S.E.2d at 654-55 (internal quotation marks and citations omitted).  "Because Smith

was not the named insured (or the named insured's spouse or resident relative), but was only using

the vehicle with Washnok's permission, she is a Class II insured," and as such, the court concluded

Smith was not entitled to stack coverage.  *Id*. at 56, 614 S.E.2d at 655.

While the court acknowledges it has found no Virginia case on point, the court concludes

that Virginia would not determine Plaintiff is entitled to UIM coverage simply because he is listed

as an "insured driver."  Because the court finds no ambiguity in the Policy language, and because

the Policy language does not provide UIM coverage for Plaintiff, the court grants Nationwide's

Motion for Summary Judgment.

<u>**CONCLUSION**</u>

It is therefore **ORDERED**, for the foregoing reasons, that Nationwide's Motion for Summary Judgment is **GRANTED**.

**AND IT IS SO ORDERED**.

PATRICK MICHAEL DUFFY
United States District Judge

**Charleston, South Carolina**
**May 15, 2008**

24